# EXHIBIT

## "C"

## TRANSPORTATION AGREEMENT

### (the "Agreement")

### by and between

## LOGISTICARE SOLUTIONS, LLC ("LGTC")

### and

*SMR Ambulance Services* ("Provider")

WHEREAS, LGTC provides transportation brokerage services to eligible Participants ("Participants") for the provision of non-emergency transportation services in the State of New Jersey under contract (the "Client Contract") to certain public agencies and/or private organizations ("Client"); and

WHEREAS, LGTC wishes to enter into Agreements with qualified transportation companies for the provision of high-quality transportation services; and

WHEREAS, Provider provides, among other things, non-emergency transportation services and wishes to enter into this Agreement for the provision of services under the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### GENERAL TERMS AND CONDITIONS

1. <u>Definitions</u>. For purposes of this Agreement and all Exhibits, the following terms have the meanings as defined below:
   a) "Agreement" shall mean this Transportation Agreement, including all exhibits, and incorporates by reference the New Jersey LGTC Provider Manual. Provisions of this Agreement shall prevail in the event of any conflict between this Agreement and any provision of the Provider Manual.
   b) "Client" shall mean the party or entity with whom LGTC has a Client Contract. Although the singular form is used "Client" shall be understood as plural in the event that LGTC is under agreement with more than one party or entity in the state in which Provider operates.
   c) "Client Contract" shall mean the agreement between LGTC and any other party or entity pursuant to which LGTC provides non-emergency transportation management services for covered Participants. Although the singular form is used

"Client Contract" shall be understood as plural in the event that LGTC is under agreement with more than one party or entity in the state or states in which Provider operates.

d)     "Criminal background check" shall mean a national search for criminal convictions and sex offender status during the past seven (7) years that is conducted by a nationally recognized credentialing organization that is pre-approved by LGTC, and conducted pursuant to LGTC's background check requirements.

e)     "Curb-to-curb" shall mean transportation service whereby the Participant meets and boards the vehicle at the curb of the pick-up address and disembarks at the curb of the drop-off address.

f)     "Door-to-door" shall mean transportation service whereby the driver parks the vehicle and meets the Participant at the threshold of the primary entrance of the pick-up address; assists the Participant to and into the vehicle, and delivers the Participant to the threshold of the primary entrance of the drop-off address.

g)     "Group Trip" shall mean any trip that has the same pick-up address and time and same drop-off address and time as a trip for another Participant.

h)     "Shared Ride Trip" shall mean any trip that has the same pick-up address and time as a trip for another Participant and whose drop-off address and time are near enough that the two trips could reasonably share the same vehicle. "Shared Ride Trip" shall also mean any trip that has the same drop-off address and time as a trip for another Participant and whose pick-up address and time are near enough that the two trips could reasonably share the same vehicle.

i)     "Job number" shall mean a unique confirmation number generated by LGTC for each trip reservation for each date of service.

j)     "Multi-load" shall mean a situation in which more than one Participant is transported in a vehicle at the same time to the same or different drop-off addresses.

k)     "Participant" shall mean any individual covered under the terms of Client Contract and on whose behalf LGTC arranges transportation services.

l)     "Reroute" shall mean a trip reservation that is refused by Provider and that is sent back to LGTC to be directed to a different transportation provider.

m)    "Ten-panel drug screen" shall mean a urine based drug test that screens for the use of Amphetamines, Barbiturates, Benzodiazepines (including Valium, Restoril, Xanax and Librium), Cocaine, Methadone, Methaqualone, Marijuana, Opiates and Phencyclidine (PCP), and Propoxyphene (Darvon).

n)     "Will call" shall mean a pick-up time that is not available at the time of reservation and that will be set based upon the time of a telephone call from the Participant to the Provider (or LGTC) when he or she is ready to be picked-up after a medical appointment.

2.     Responsibilities of LGTC.

a)     Process Transportation Requests.   LGTC will receive transportation requests from Participants or their agents, verify Participant eligibility, schedule

reservations, submit daily reservation requests to Provider (collectively referred to as a "Provider Manifest"), verify billing information, and perform such other administrative functions as LGTC deems necessary to provide quality transportation to Participants on behalf of its Client. Notwithstanding anything herein to the contrary, LGTC shall be under no obligation to provide Provider with a specific number of transportation requests. Any trip request assigned to Provider may be withdrawn by LGTC, in its sole discretion, in the event that LGTC deems it necessary for the proper performance of its obligations under the Client Contract.

b)  **Payments for Transportation.** LGTC shall pay Provider for its services at the rates and on the terms set forth in Exhibit B. Provider shall not invoice or require payment from Participants or the Client for such services.

c)  **Orientation.** LGTC shall provide one or more orientation sessions for Provider staff, which will be offered at a LGTC regional office or the Provider's base of operations. Provider is responsible for ensuring that it and its employees understand all requirements and procedures for the provision of services pursuant to this Agreement.

3.  **Responsibilities of Provider.**

a)  **Administrative, Reservation Receipt, and General.**
    i)    Provider shall comply with applicable city, county, state and federal requirements regarding licensing, certification and insurance for all personnel and vehicles.
    ii)   Provider shall utilize only drivers and vehicles that are registered with and pre-approved by LGTC to perform services under this Agreement.
    iii)  Provider shall provide proof that all registered vehicles meet all minimum standards and requirements to perform services under this Agreement.
    iv)   Provider shall provide proof that all drivers and attendants have acceptable MVR, criminal background checks, and drugs screen records as set forth in the "Driver and Attendant Qualifications" section of this Agreement.
    v)    Provider shall ensure the safety of the Participants that it transports.
    vi)   Provider shall provide one or more of the following modes of transportation: ambulatory sedan or van, wheelchair van, stretcher van, or non-emergency ambulance.
    vii)  Provider shall provide curb-to-curb service as the standard service although door-to-door service may be required in certain circumstances.
    viii) Provider shall establish and maintain both a telephone line and fax line for use by LGTC to contact Provider. Fax lines shall be equipped with a fax machine that provides reasonably unrestricted access to LGTC to send faxes to Provider. Provider shall receive trip reservations via fax or

modem from LGTC each day and confirm the receipt thereof in a form acceptable to LGTC. For same day or urgent medical appointments, including hospital discharges, Provider shall accept reservations and job numbers from LGTC by telephone.

ix)  Provider shall transport Participants, adult escorts, transportation attendants, or personal assistants as applicable and in accordance with the specifications of the reservations provided by LGTC and the terms of this Agreement. Provider, upon consultation with LGTC, may refuse to transport any person who, in the judgment of the Provider, is a threat to the health, safety, or welfare of either Provider's employees or other Participants, or prevents or inhibits the vehicle from being operated in a safe manner.

x)  Provider shall reroute trip assignment at least 24-hours prior to the scheduled pick-up time to allow LGTC to make alternative arrangements. This requirement only applies to trip reservations that have been submitted to Provider at least 36 hours prior to the scheduled pick-up time. In the event that Provider does not provide 24-hours notice and LGTC must make, as a result of the short notice, premium price alternate transportation arrangements, Provider will be responsible for any additional charges incurred by LGTC. These charges may be deducted from amounts owed to Provider. This provision does not apply to circumstances beyond the control of Provider (e.g., sudden vehicle breakdown or vehicle accident).

xi)  Provider will ensure that all information obtained regarding Participants in connection with this Agreement is held in strict confidence and is used only as required in the performance of Provider's obligations. (For further confidentiality requirements, see Exhibit C – Business Associate Agreement.)

xii)  Provider shall promptly inform LGTC if a Participant is assigned to an improper level of service (i.e., ambulatory patient assigned to a wheelchair trip, or wheelchair bound patient assigned to an ambulatory trip).

b)  <u>Pick Up and Delivery Standards</u>. Provider shall provide transportation services that comply with the following minimum service standards. LGTC's or Client's staff, or their official agent, may ride on trips with the Participant to monitor service.

i)  On time performance of scheduled pick-ups shall be the standard practice. "On time" means at the scheduled pick up time or up to fifteen minutes after that time. In addition, early arrival of the vehicle is permissible so long as no Participant is required to board the vehicle before the scheduled pick-up time. Arrival more than fifteen minutes after the scheduled pick-up time is considered a "late pick-up". The monthly average wait time for all pick-ups performed by Provider may not exceed

15 minutes after the scheduled pick-up time and the actual wait time for any specific pick-up may not exceed 30 minutes after the scheduled pick-up time.

ii)     The driver shall make his presence known to the Participant upon arrival at the pick-up address and must wait at least ten (10) minutes after the scheduled pick-up time before the Participant may be considered a "no show". If the Participant is not present for pick up, the driver shall notify Provider's dispatcher before leaving the pick-up location and document the attempted pick-up on the daily trip log.

iii)    Provider shall deliver the Participant to scheduled medical appointments within fifteen (15) minutes of the medical appointment time as standard practice, however, an earlier drop off before the appointment time may be acceptable in unusual situations on a case-by-case basis. However, in no event shall a Participant be dropped off for a medical appointment more than fifteen (15) minutes before the opening time of a medical office or facility. Provider shall ensure that Participants are picked up at pre-arranged times for the return trip if the medical service provider follows a regular schedule. The prearranged times may not be changed by Provider or the driver without prior permission from LGTC. Provider's timely delivery of Participants to scheduled medical appointments may be included as a measure of on-time performance.

iv)     For "will call" return pick-up reservations from a medical appointment, the Provider shall arrive within ninety minutes after the time Provider is notified that the Participant is ready, or by the close of the business day for the medical service provider, whichever is earlier.

v)      If a delay of fifteen (15) minutes or more occurs in the course of picking up scheduled riders, Provider must contact waiting Participants at their pick-up points to inform them of the delay and the expected arrival time of the vehicle. Provider must advise scheduled riders of alternate pick-up arrangements when appropriate.

vi)     If a delay occurs that will result in a Participant being late for a medical appointment, Provider must contact LGTC who will notify the medical provider of the late arrival.

vii)    For same day hospital discharge reservations, Provider shall pick-up Participants within three hours after accepting the trip reservation from LGTC.

viii)   No Participant in a multi-load vehicle shall remain in the vehicle more than forty-five (45) minutes longer that the average travel time for direct transport from point of pick-up to destination.

ix)     No more than 2% of Provider's assigned trips shall be late or missed pick-ups. Providers with greater than 1% of their assigned trips as missed pick-ups may have their trips reduced. Habitual failure to meet this standard shall be a material breach of this Agreement and may result in termination of this Agreement.

x) An adult escort at least twenty-one (21) years of age or older shall be permitted to accompany a child under twenty-one (21) years of age, and in some cases, an adult escort may be required to accompany the child. Provider shall, at no additional charge, transport an adult escort of a minor Participant if and as directed by LGTC. A minor Participant shall be transported in the rear seat or compartment of the vehicle and shall not be permitted to travel as a front seat passenger.

xi) A transportation attendant or personal assistant may ride with a Participant if necessary to assist the Participant. The attendant or assistant shall assist the patient and the driver as requested.

xii) Provider must allow service animals in the vehicle, as needed; however, other animals shall not be allowed on board the vehicle.

xiii) Provider shall confirm the scheduled pick-up time with the Participant at least 24-hours prior to the scheduled pick-up.

c) <u>General Vehicle Requirements</u>. All vehicles utilized by Provider in the performance of services under this Agreement must meet the requirements listed below. Each vehicle is subject to an initial and bi-annual inspection by LGTC as well as interim inspections as required by LGTC in its sole discretion. All vehicles must be made available to Client or its agent(s) for inspection at any time. Inspections performed by LGTC do not replace or excuse the Provider from obtaining vehicle safety inspections as required by state or local law. Documentation of inspections performed by other agencies may suffice as long as LGTC and Client have access to the inspection records, and the inspection standards meet or exceed those of this Agreement. Any vehicle found non-compliant with the following inspection standards, New Jersey licensing requirements, safety standards, New Jersey Highway and Transportation Department, or ADA regulations, or other State or Federal laws or regulations shall be immediately removed from service and shall pass a re-inspection before it may be used to provide transportation services for Participants under this Agreement.

i) Vehicles shall comply with the Americans with Disabilities Act (ADA) Accessibility Specifications for Transportation as well as Federal Transit Administration (FTA) regulations, as applicable for the type of vehicle utilized by Provider.

ii) The number of occupants in the vehicle, including the driver, shall not exceed the vehicle manufacturer's approved seating capacity.

iii) All vehicles shall have adequately functioning heating and air-conditioning systems and at all times shall maintain a temperature that is comfortable to the Participant.

iv) All vehicles shall have functioning seat belts and restraints as required by applicable law. All vehicles shall have an easily visible interior sign that states: "ALL PASSENGERS SHALL USE SEAT BELTS". Seat belts must be stored off the floor when not in use.

v)      Provider shall have at least two seat belt extensions available in each vehicle.

vi)     All vehicles shall be equipped with at least one seat belt cutter that is kept within easy reach of the driver for use in emergency situations.

vii)    All vehicles shall have an accurate, operating speedometer and odometer.

viii)   All vehicles shall have two exterior rear view mirrors, one on each side of the vehicle.

ix)     All vehicles shall be equipped with an interior mirror for monitoring the passenger compartment.

x)      The exterior of all vehicles shall be clean and free of broken mirrors or windows, excessive grime, major dents, or paint damage that detracts from the overall appearance of the vehicles.

xi)     The interior of all vehicles shall be clean and free of torn upholstery, torn or damaged floor or ceiling covering, damaged or broken seats, protruding sharp edges, dirt or litter, oil, grease, hazardous debris, or unsecured items.

xii)    All vehicles and equipment must be maintained and operated in accordance with the manufacturers' state and federal safety and mechanical operating and maintenance standards.

xiii)   All vehicles shall have Provider's business name and telephone number displayed on at least both exterior sides.

xiv)    The vehicle license number and LGTC's toll-free and local phone numbers shall be prominently displayed in the interior of each vehicle. This information, together with complaint procedures provided by LGTC shall be available in writing and stored in a clearly visible location in each vehicle for distribution to Participants upon request.

xv)     Smoking shall be prohibited in all vehicles at all times. All vehicles shall have an easily visible interior sign that states: "NO SMOKING".

xvi)    All vehicles shall carry a vehicle information packet containing vehicle registration, insurance card, and accident procedures and forms.

xvii)   All vehicles shall be equipped with a first aid kit stocked with antiseptic cleansing wipes, triple antibiotic ointment, assorted sizes of adhesive and gauze bandages, tape, scissors, latex or other impermeable gloves and sterile eyewash.

xviii)  All vehicles shall be equipped with three (3) portable triangular reflectors mounted on stands. Use of flares is prohibited and may not be carried on board.

xix)    All vehicles shall carry extra electrical fuses.

xx)     All vehicles shall carry a functioning flashlight and an ice scraper.

xxi)    All vehicles shall be equipped with a "spill kit" that includes liquid spill absorbent, latex or other impermeable gloves, hazardous waste disposal bags, scrub brush, disinfectant and deodorizer.

xxii)   All vehicles shall contain a current map of the applicable geographic area with sufficient detail to locate Participant and medical provider addresses.

xxiii)  All vehicles shall be equipped with a working fire extinguisher that shall be stored in a safe location.

xxiv) Provider shall utilize only its own leased or owned vehicles and shall not sublet, subcontract or arrange for transportation under this Agreement from any third party.

xxv) All vehicles must be equipped with a two-way communications system linking each vehicle with the Provider's primary place of business. Cell phones are acceptable, but pagers are not acceptable substitutes. A vehicle with an inoperative two-way communication system shall be placed out of service until the system is repaired or replaced.

xxvi) All vehicles must properly utilize approved child safety seats when transporting children in accordance with New Jersey laws and regulations. Participants are responsible for providing child safety seats when transporting children under the age of eight (8) years old or eighty pounds. Upon arrival for transportation, if the Participant does not provide safety seat(s) for any child under age of eight (8) years old or eighty pounds, the Provider shall not transport the child and shall advise the Participant to reschedule the appointment.

xxvii) All vehicles shall have a functioning interior light within the passenger compartment.

xxviii) All vehicles shall have adequate sidewall padding and the vehicle's floor must be covered with commercial anti-skid flooring or carpeting. Flooring or carpeting in vehicles equipped to transport wheelchair passengers shall not interfere with wheelchair movement between the lift and the wheelchair positions.

xxix) All vehicles shall be equipped with a retractable step, fixed sideboard (running board), or a step stool approved by LGTC to aid Participant boarding. This step shall be capable of safely supporting 300 lbs and shall be no more than 12 inches above ground level. The step shall have a nonskid top surface no less than eight inches by twelve inches. Removable steps shall be properly secured while the vehicle is in motion. Under no circumstances will a milk crate or similar substitute be accepted as a substitute for a step stool.

d) <u>Wheelchair Vehicle Requirements</u>. All vehicles used to transport wheelchair passengers ("Wheelchair Vehicle") must meet the General Vehicle Requirements set forth above as well as the following additional requirements.

i) Each Wheelchair Vehicle must maintain a floor-to-ceiling height clearance in the passenger compartment of at least fifty-six (56) inches.

ii) Each Wheelchair Vehicle must have an engine-wheelchair lift interlock system that requires the Wheelchair Vehicle's transmission to be in park and the emergency brake engaged to prevent vehicle movement when the lift is deployed.

iii) All wheelchair ramps used on vehicles shall be certified as capable of regularly servicing a six hundred pounds (600 lbs) load.

iv) Each Wheelchair Vehicle with a hydraulic or electromechanical powered

wheelchair lift must have the lift mounted so not to impair the structural integrity of the vehicle. The lift must meet the following specifications:

a)  is capable of elevating and lowering a 600-pound load without the outer edge of the lift sagging, or tilting downwards more than one inch, nor shall the platform deflection be more than three (3) degrees under a 600-pound load;

b)  the lift platform must be at least thirty (30) inches wide and forty-eight (48) inches long;

c)  the lift platform shall not have a gap between the platform surface and the roll-off barrier greater than 5/8 of an inch. When raised, the gap between the platform and the vehicle floor shall not exceed 1/2 inch horizontally and 5/8 inch vertically;

d)  the lift controls shall be accessible and operable from inside or outside the vehicle, and shall be secure from accidental or unauthorized operation;

e)  the lift shall be powered from the vehicle's electrical system. The lift platform shall be able to be raised/lowered manually with passengers and/or shall provide a method to slow free-fall in the event of a power failure or component failure;

f)  the lift operation shall be smooth without jerking motion. Movement shall be less than or equal to six (6) inches per second during lift cycle and less than or equal to twelve (12) inches per second during stowage cycle;

g)  the lift platform shall not be capable of falling out of or into the vehicle when in storage in the passenger compartment, even if the power should fail;

h)  all sharp edges of the lift structure which might be hazardous to passengers shall be padded or ground smooth;

i)  the lift platform shall have a properly functioning, automatically engaged, anti-roll-off barrier, with a minimum of one (1) inch on the outbound end to prevent ride over;

j)  it is preferable that the platform when stored not intrude into the body of the vehicle more than twelve (12) inches and shall be equipped with permanent vertical side plates to a height of at least two (2) inches above the platform surface;

k)  the lift platform surface shall be equipped with non-skid expanded metal mesh or equivalent, to allow for vision through the platform; and

l)  the lift platform must be equipped with a hand rail on both sides of the platform to assist loading or unloading ambulatory passengers. The handrail shall meet the following requirements:
- maximum height of thirty-eight inches;
- minimum knuckle clearance of 1.5 inch;
- able to withstand a force of 100 pounds; and

- shall not reduce the lift platform width of at least thirty (30) inches.

v)  Each wheelchair position in all vehicles shall have a wheelchair securement device (or "tie down") which shall:

  a)  be placed as near to the accessible entrance as practical, providing clear floor area of 30 inches by 48 inches. Up to six (6) inches may be under another seat if there is nine (9) inches height clearance from floor. All wheelchairs shall be forward facing;

  b)  be tested to meet a 30 mph/20gm standard;

  c)  securely restrain the wheelchair during transport from moving forward, backward, lateral and tilting movements in excess of (2) inches;

  d)  be adjustable to accommodate all wheel bases, tires (including pneumatic), and motorized wheelchairs;

  e)  have a lock system, belt system, or both. If a belt system is used, the cargo strap when not in use shall be retractable or stored on a mounted clasp or in a storage box. A tract mounting lock system on the floor shall be flush with the floor and shall not be an obstruction or a tripping hazard. In all cases the straps shall be stored properly when not in use; and

  f)  provide seat belts and/or shoulder harness that are attached to the floor or to the side wall of the vehicle, that shall be capable of securing both the passenger and wheelchair.

vi)  Each wheelchair entrance door shall:

  a)  maintain a minimum vertical clearance of fifty-six (56) inches and a minimum clear door opening of thirty (30) inches wide;

  b)  have no lip or protrusion at the door threshold of more than 1/2 inch, and

  c)  be equipped with straps or locking devices to hold the door open when the lift or ramp is in use.

e)  <u>Stretcher Vehicle Requirements</u>. Stretcher van service is an alternative mode of non-emergency transportation. It shall be provided to an individual who cannot be transported in a sedan or wheelchair van and who does not need the medical services of an ambulance. All stretcher vehicles must meet the General Vehicle Requirements set forth above as well as the following additional requirements.

A driver and an attendant shall staff the vehicle, which shall be specifically designed and equipped to provide non-emergency transportation of individuals on an approved stretcher. A stretcher vehicle shall be used for an individual who:

i)  Needs routine transportation to or from a non-emergency medical appointment or service.

ii)  Is convalescent or otherwise non-ambulatory and cannot use a wheelchair.

iii)  Does not require medical monitoring, medical aid, medical care or medical treatment during transport. Self-administered oxygen is permitted as long

as the oxygen tank is secured safely.

The following restrictions apply:

i)  A stretcher passenger shall not be left unattended at any time.

ii) The driver and attendant shall confirm that all restraining straps are fastened properly and that the stretcher, stretcher fasteners and anchorages are properly secured.

iii) The attendant shall be seated in the passenger compartment while the vehicle is in motion and shall notify the driver of any sudden change in the passenger's condition.

iv) The stretcher vehicle shall not be used:

    a)  for emergency medical transportation;

    b)  to transport a passenger who requires basic or advanced life support;

    c)  to transport a passenger who has in place any temporary invasive device (including a saline lock), equipment such as an intravenous administration device, or an airway maintenance device. However, the Participant is eligible for transportation if he/she has a battery-operated ventilator and an adult escort trained to provide ventilator care will travel with the Participant, and if no other medical equipment or care is required.

    d)  to transport a passenger who requires close observation or medical monitoring;

    e)  to transport more than one (1) stretcher passenger at a time.

f)  <u>Non Emergency Ambulance Vehicle Requirements</u>.  All vehicles used to transport Participants that require covered non-emergency BLS or ALS service must meet the General Vehicle Requirements set forth above as well as the following additional requirements.  State or local laws or regulations establishing minimum operational standards for Ambulances shall supersede the following provisions.

i)  Ambulance vehicle must have at least one (1) gurney that is capable of supporting 400 pounds or more.

ii) Each gurney must have the capability to be lowered and raised from a height of 18" to a height necessary to load the gurney into the vehicle without requiring the gurney to be manually lifted from the ground.

iii) Each gurney must be equipped with no less than one safety belt.

iv) Ambulance vehicle must have the necessary equipment to "lock" the gurney securely in place while in the vehicle.

g)  <u>Driver and Attendant Qualifications</u>.  All drivers and attendants used to perform services under this Agreement shall, at a minimum, meet the applicable qualifications listed below.  Each driver's and attendant's records and qualifications are subject to an initial and annual inspection by LGTC as well as interim inspections as required by LGTC in its sole discretion.  Any driver or

attendant failing, at any time, to meet all of the applicable qualifications, or any requirements imposed by state or local law, shall be prohibited from providing service under this Agreement. LGTC and the Client reserve the right to disallow any driver or attendant from performing services under this Agreement.

i)      All new drivers and attendants shall be at least twenty-one (21) years of age and have a current valid driver's license to operate the transportation vehicle to which they are assigned.   Drivers or attendants that are employed by Provider and perform services for at least ninety (90) days prior to July 1, 2009 and are under the age of twenty-one on the date of execution of this Agreement are "Grandfathered" and are permitted perform service.

ii)     Drivers who receive any combination of three (3) moving violations or accidents where the driver was at fault during the previous thirty-six (36) months shall be removed from service.

iii)    Drivers shall not have had their driver's license suspended or revoked in the previous three (3) years. Provider may submit to LGTC for review by the Client any driver whose license has been suspended or revoked as a result of non-moving violations and approval to perform services by such driver will be made by the Client on a case-by-case basis and at the sole and absolute discretion of the Client.

iv)     Provider shall perform an initial and annual criminal background checks for all drivers, attendants and owners, or as may be additionally required by New Jersey law or regulations. The following will preclude a driver or attendant from providing services under this Agreement: (1) conviction for driving while intoxicated or under the influence of a controlled substance within three (3) years prior to delivery of services under this Agreement; (2) plea of guilty or *nolo contendere* or conviction for any felony that is sexual in nature or involves a child, the elderly, domestic abuse, drugs, weapons or violence in the previous seven (7) years.

v)      Provider shall obtain finger print checks for all driver, attendants and owners through the appropriate New Jersey law enforcement entity or through the national FBI fingerprint check program.   Drivers and attendants may be allowed to perform service for up to sixty (60) days pending the result of the fingerprint check. Provider must also verify that drivers or attendants are not listed on the New Jersey Sex Offender Registry.

vi)     All drivers must meet current state and federal motor carrier safety regulations and guidelines.

vii)    Each driver must have competent driving habits.

viii)   Provider shall not utilize drivers or attendants who are known abusers of alcohol or known consumers of narcotics or drugs/medications that would endanger the safety of Participants. If Provider suspects a driver to be driving under the influence of alcohol, narcotics or drugs/medications that could endanger the safety of Participants, Provider shall immediately remove the driver from providing service under this Agreement. Each

driver and attendant shall successfully pass an initial ten-panel drug screen for traces of illicit drugs prior to providing service under this Agreement. Providers must perform an annual ten-panel drug screen of all drivers and attendants, or alternatively may utilize a random drug testing program as long as 25% of its drivers are tested randomly each year with a 10 panel drug screen and all results are submitted to LGTC. Provider shall ensure that the current laws regarding drug and alcohol testing are enforced for all drivers and attendants and shall conduct separate and independent drug testing as may be required by the DOT.

ix)   Provider shall ensure that all drivers and attendants have been trained in Passenger Assistance, Blood Borne Pathogens and First Aid. Drivers must also be trained in Defensive Driving. Provider shall have forty-five (45) days from date of hire to submit to LGTC proof that drivers and attendants have completed all required training requirements. Drivers and attendants may provide services under this Agreement during the aforesaid forty-five (45) day period.

h)   <u>Driver and Attendant Service Requirements and Performance</u>

i)    No driver or attendant shall use alcohol, narcotics, illegal drugs or drugs that impair his or her ability to perform while on duty or abuse alcohol or drugs at any time. A driver or attendant can use prescribed medication as long as his/her duties can still be performed in a safe manner and Provider has written documentation from a physician or pharmacist that the medication will not impact the ability of the driver.

ii)   No drivers or attendants shall allow firearms, alcoholic beverages in opened containers, unauthorized controlled substances, or highly combustible materials to be transported in the vehicle.

iii)  No drivers or attendants shall solicit or accept controlled substances, alcohol or medications from Participants.

iv)   No drivers or attendants shall make sexually explicit comments, or solicit sexual favors, or engage in sexual activity while in the course of their job duties.

v)    No drivers or attendants shall solicit or accept money from Participants except for the collection of applicable co-payments as authorized by the Client.

vi)   All drivers and/or attendants shall provide an appropriate level of assistance to a Participant when requested or when required by the Participant's physical condition.

vii)  All drivers and attendants shall wear and have visible a nametag that is easily readable and includes their name and the name of the Provider.

viii) No drivers or attendants shall smoke while in the vehicle, while assisting a Participant, or in the presence of any Participant. Participants shall not be allowed to smoke in the vehicle.

ix)   No drivers or attendants shall wear any type of headphones while on duty, with the exception of hands-free headsets for mobile telephones. Mobile

telephones may only be used in performance of services under this Agreement, and driver shall at all times comply with applicable laws regarding the use of cell phones by the driver of a moving vehicle.

x)      All drivers shall park the vehicle so that the Participant does not have to cross streets to reach the entrance of the destination.

xi)     No drivers or attendant shall leave a Participant unattended at any time.

xii)    All drivers and/or attendants must identify themselves and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up location is not apparent.

xiii)   All drivers and attendants must assist the Participants in the process of being seated, including the fastening of seat belts. Drivers shall confirm prior to moving the vehicle that wheelchairs and wheelchair passengers are properly secured and that all Participants are properly belted in their seat belts.

xiv)   All drivers and/or attendants must assist Participants to exit the vehicle and to move to the access area of the Participant's destination. All drivers shall confirm that the delivered passenger is safely inside his or her destination prior to vehicle departure.

xv)    All drivers and/or attendants must provide physical support or assistance and oral directions to Participants.  Such assistance shall also apply to wheelchairs and mobility-limited persons as they enter or exit the vehicle using a wheelchair lift or ramp.  Such assistance shall also include stowage of mobility aids such as canes, walkers and folding wheelchairs.

xvi)   All drivers and/or attendants shall assure that any packages are safely stored before the driver moves the vehicle.  Drivers and/or attendants are not responsible for Participant's personal items.

xvii)  All drivers and attendants shall be courteous, patient and helpful to all Participants and be neat and clean in appearance.

xviii) If a Participant or other passenger's behavior or any other condition impedes the safe operation of the vehicle, the driver shall park the vehicle in a safe location out of traffic, notify the Provider, and request assistance.

xix)   All drivers shall maintain a daily trip log that includes the following information:

a)      Provider name;
b)      Provider ID number
c)      vehicle number;
d)      driver's name;
e)      driver's signature
f)      names of Participants transported
g)      Participant signature for each drop off
h)      no show indicator, if applicable;
i)      actual arrival time at pick-up point;
j)      actual arrival time at drop-off point;
k)      date of service;

l)     name of attendant (if any) and attendant's signature;

m)    authorization stamp or signature of Provider, and

n)    any other pertinent information regarding completion of trips.

i)    <u>Licensure, & Certification</u>

    i)    Provider warrants that it has never been terminated from participation in any state Medicaid or Medicare program or been determined to have committed Medicaid or Medicare fraud.

    ii)    Provider shall comply with all applicable city, county, state and federal laws and regulations, including all laws and regulations setting requirements regarding licensing, certification and insurance for all transportation related personnel and vehicles. Such laws or regulations shall take priority over any conflicting provision of this Agreement and the enforcement of the conflicting provision of this Agreement is hereby waived.

    iii)    Provider warrants that it has and shall maintain throughout the term of this Agreement all licenses and certificates required by any federal, state, county or local governments, including but not limited to all licenses, registrations, or certificates required to provide transportation for hire. Provider will furnish LGTC with such documentation immediately upon request.

    iv)    Provider warrants that it has not been excluded from participation in Federal health care programs under either Section 1128 or 1128A of the Social Security Act.

j)    <u>Insurance.</u>  Provider shall maintain the following minimum levels of insurance throughout the term of the Agreement. All insurance coverage, except Workers' Compensation, shall name LGTC and the Client as "Additional Insured" and shall be primary with respect to claims and co-insurance determinations. Insurance policies shall indicate that LGTC will be informed in writing at least 30 days prior to any termination of or change in insurance coverage. Concurrently with executing this Agreement the Provider shall submit to LGTC certificates of insurance from its agent or carrier listing LGTC as "Certificate Holder" as well as LGTC and the Client as "Additional Insured. Provider shall submit additional certificates of insurance from its agent or carrier immediately upon the renewal of or change to such insurance coverage. The certificate of insurance submitted to LGTC shall confirm that the Comprehensive General Liability policy provides coverage for sexual abuse and molestation and shall confirm that the Vehicle Insurance policy provides coverage for "Any Auto". Provider agrees that LGTC may communicate directly with its insurance agent or carrier to confirm details or obtain clarification of Provider's insurance coverage or policy terms.

    (i)    <u>Vehicle Insurance.</u>

        <u>Taxis, Sedans and Multi-Passenger Vans and Wheelchair Vans</u>: The required amount of insurance is the greater of the amount required by city

or county ordinance for taxis or $ 1,000,000 per occurrence per accident. The insurance policy must cover "Any Auto".

Ambulances:  The required amount of insurance is the greater of the amount required by city, county or State ordinance or regulation, or $1,000,000 per occurrence per accident.

(ii)  Comprehensive General Liability Coverage.  $1,000,000, with "Broad Form" coverage including contractual liabilities as well as liabilities for sexual abuse and molestation.

(iii)  Workers' Compensation Insurance as required by the State of New Jersey.

k)  Indemnification.  Provider shall indemnify, protect, and hold LGTC and the Client harmless from and against any and all claims, and/or liabilities of any kind or nature whatsoever arising or alleged to arise from or related to actions connected with services provided by or at the direction of Provider or its agents, including the cost of reasonable attorney fees and other expenses incurred by or assessed against LGTC and/or the Client

l)  Provider Performance Standards/Quality Assurance Plan.  Provider agrees to participate in LGTC's quality assurance plan, which may include discussing Provider's performance in the delivery of transportation.  Provider agrees to assist in the development of corrective action plans and cooperate with all data collection that may be requested to monitor the results of such corrective action plans.

m)  Maintenance of Records.  Provider shall establish and maintain the following records and related information and provide copies thereof within three days notice, or as otherwise required under this Agreement, upon request by LGTC, the Client or its agents.  All records shall be maintained and available for review by authorized personnel during the entire term of the contract and for a period of five (5) years thereafter.  If an audit is in progress or litigation is in progress or threatened, all documents shall be maintained until such audit and/or litigation is fully resolved.  Upon reasonable notice, Provider shall permit LGTC (or designee) to examine and/or audit trip documentation for Participants and will assist LGTC in examining all requested documentation.  Providers may be required to maintain documentation for longer periods of time to the extent necessary to comply with applicable laws or regulations or the requirements of LGTC's Clients.

i)  Copy of Provider's registration with all applicable State agencies or departments.

ii)  Vehicle records, including at a minimum the following documentation for each vehicle:

a)     manufacturer and model;

b)     model year;

c)     vehicle identification number;

d)     odometer reading at the time the vehicle enters service under this agreement;

e)     type of vehicle (e.g., sedan, wheelchair van, stretcher van);

f)     capacity (number of passengers);

g)     license tag number;

h)     insurance certifications;

i)     state issued registration permit and vehicle stamp (if applicable);

j)     special equipment (lifts etc.), and

k)     date, odometer reading and description of all inspection activity (e.g., verification that vehicle meets vehicle requirements, inspection of equipment such as brakes, tire tread, turn signals, horn, seat belts, air-conditioning/heating, etc.). Records must be maintained of the initial inspection and all subsequent inspections.

iii)     Driver and attendant records, including at a minimum the following documentation:

a)     name, date of birth;

b)     copy of driver's license;

c)     MVR report for the entire history of the driver's New Jersey driver's license as reported from New Jersey Division of Motor Vehicles;

d)     driver training course certificates, including First Aid, Passenger Assistance and Blood-Borne Pathogens; and

e)     documentation of any complaints received about the driver or attendant and any accidents or moving violations involving the driver.

iv)     All daily vehicle manifests, trip logs and invoice documents.

v)     Any other records LGTC is required to collect from Provider pursuant to the Client Contract.

Provider must also establish and maintain a system for managing the records and related information set forth in Exhibit C. Provider must furnish such records to LGTC, the Client or its agents upon three days' notice.

n)     <u>Accidents or Incidents.</u> Provider shall inform LGTC immediately of any vehicle collision or accident that occurs while a vehicle operated by Provider is in route for a LGTC assigned trip whether or not a Participant is in the vehicle at the time of the collision or accident. Provider shall also inform LGTC immediately of any incident resulting in injury to a Participant, driver or other passenger; any moving violation that occurs while delivering services under this Agreement, and any other incident involving a Participant that could result in liability to Provider or LGTC. The Provider shall file a written report with LGTC within three (3)

working days of any accident, incidents, or moving violation and shall cooperate with LGTC and the Client during any ensuring investigation.  Provider shall include a copy of any police reports and tickets/summons with its written report as supporting documentation.

o)   Independent Contractor.  The relationship between LGTC and Provider is solely that of independent contractors and nothing in this Agreement or otherwise shall be construed or deemed to create any other relationship including one of employer and employee or principle and agent or joint venture or any relationship other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of this Agreement.  Provider is solely responsible for the management, compensation, and payment of employment related taxes and insurance for its employees, including but not limited to workers' compensation and unemployment insurance.

p)   Liquidated Damages.   Provider agrees that failure to perform services in conformance with this Agreement may cause LGTC to be damaged in amounts that will be difficult or impossible to determine.  Therefore, Provider agrees that the sums set forth in Exhibit A are reasonable as liquidated damages for the specified occurrences.   Provider further agrees that the liquidated damages specified below are in lieu of actual damages for such occurrences.  Provider hereby waives any defense as to the validity of such liquidated damages on the grounds that they are void as penalties or are not reasonably related to actual damages.   Provider shall pay to LogistiCare on demand for each such failure the liquidated damages set forth in Exhibit A.

q)   Term and Termination.
   i.   Term.  The term of this Agreement shall be one year from the effective date set forth on the signature page.  It shall be automatically renewed for up to four successive one-year periods unless either party shall give notice of termination 45 days prior to the last day of any term.  In addition, either party may terminate this Agreement without cause upon 60 days written notice.  Either party may terminate this Agreement upon 30 days written notice in the event of a material breach of the Agreement, provided that the non-breaching party shall have first provided the other party with written notice and description of the breach and ten days to cure the breach.
       LGTC may terminate the Agreement immediately upon reasonable evidence that Provider has engaged in illegal, threatening or fraudulent activity, or other misconduct, including but not limited to, falsifying trip logs or billing invoices, paying or offering to pay kickbacks to a Participant(s), or engaging in threatening verbal or physical conduct toward a Participant(s) or LGTC staff.  Provider also acknowledges that LGTC may terminate this Agreement immediately if so directed by Client

    ii.   <u>Minimum Trips</u>. Provider agrees that this Agreement does not guarantee a minimum number of trips to be assigned from LGTC, and that actual trip volume can vary. Provider also agrees that in the event that no trips are assigned from LGTC that this Agreement will remain in force and that Provider will accept such occasional trips as may be assigned. If Provider is not regularly assigned trips and wishes to terminate this Agreement, then Provider must terminate this agreement by providing aforesaid notice to LGTC.

    iii.   <u>Specific Provision #1</u>. Provider acknowledges that LGTC is prohibited from establishing or maintaining service agreements with a Provider who has committed fraud against a state or federal agency or has been suspended, terminated or barred from participation in the Medical Assistance Program. Provider acknowledges that LGTC is required by the Client Contract to terminate a service agreement with a Provider that habitually provides substandard performance, as determined by the Client, or with a Provider that has failed to take satisfactory corrective action within a reasonable time period not to exceed 30 days from the date of notice of the unacceptable performance. Provider acknowledges that Client reserves the right to direct LGTC to terminate any service agreement with a Provider when the Client determines it to be in the best interest of its program.

    iv.   <u>Specific Provision #2</u>. In the event that LGTC is in default under the Client Contract, this Agreement may, at the discretion of the Client, be assigned to the Client or its agent for continued provision of transportation services. All terms, conditions and rates established by the Agreement will remain in effect until or unless renegotiated with Client or its agent subsequent to the default action.

r)   <u>Assignment</u>. Provider may not assign, transfer, delegate, consign, or convey to any other person or entity Provider's rights and responsibilities hereunder without the express written consent of LGTC, such consent to be withheld in LGTC's sole discretion. Any attempted unauthorized assignment shall be null and void. LGTC may assign its rights and obligations under this Agreement to an affiliated entity and any such assignment shall be communicated to Provider by written notice.

s)   <u>Additional Provisions</u>.

    i.   <u>Governing Law</u>. This Agreement shall be governed by and construed in all respects in accordance with the laws and regulations of the State of New Jersey, without giving effect to principles of conflicts of law.

    ii.   <u>Headings</u>. The headings and titles of the sections of this Agreement are inserted for convenience only and shall not affect the construction or interpretation of any provision herein.

iii.     <u>Non-solicitation</u>.  Neither Provider nor LGTC shall solicit for employment any current employee of the other party nor employ any former employee of the other party for a period of one year from the time any such employee terminates or is terminated from his or her position with the other party

v.      <u>Confidentiality</u>.  Provider shall treat all information obtained by it through its performance under this Agreement as confidential, and shall not use any information so obtained in any manner other than to discharge its obligations under this Agreement, or as otherwise specifically provided for herein. Provider agrees to sign and abide by any subsequent agreements with respect to confidentiality as may be required by the Health Insurance Portability and Accountability Act (HIPAA) and any similar laws.  Both LGTC and the Client shall have unrestricted authority, to the extent permitted by law, to reproduce, distribute, or use in whole or in part any submitted reports, data or materials associated with any services provided by Provider under this Agreement.

vi.     <u>Notices</u>.  All written notices required by this Agreement shall be deemed delivered either on the date of receipt if personally delivered; on the day following mailing if sent postage prepaid by overnight mail through a nationally recognized overnight carrier, or on the third day following mailing if mailed postage prepaid certified return receipt requested. Such notices shall be sent to the following addresses as appropriate, or to such other addresses as the parties may hereafter designate:

to LGTC at:
      LogistiCare Solutions, LLC
      1800 Phoenix Blvd, Suite 120
      College Park, Georgia 30349
      Attn: Chief Operations Officer

to Provider at: _646 Rt - 18 North_
      _Suite  117A_
      _East Brunswick, NJ_
      _08816_

vii.     <u>Amendments</u>.  This Agreement (including Exhibits) may be amended only by a document in writing duly executed by an authorized representative of both parties.

viii.     <u>Client Amendment</u>.  This Agreement is subject to approval by the Client. In the event that the Client at any time requires modifications to this

Agreement, the parties hereto will execute amendments to this Agreement reflecting such modifications. If either party is unwilling to accept any such modifications required by the Client, such party may exercise its termination rights hereunder.

ix.      <u>Dispute Resolution and Arbitration</u>.  If any claim or controversy arising out of or relating to this Agreement cannot be resolved by the parties in the normal course of business, each party shall designate a member of its senior management to meet in an attempt to resolve the dispute.  If the dispute cannot be resolved to the satisfaction of the parties in this manner, the dispute shall be referred for binding arbitration in accordance with the commercial dispute arbitration rules of the American Arbitration Association.  Each party shall bear its own costs and expenses and an equal share of the arbitrators' fees and other administrative fees related to the arbitration. Judgment upon an award in arbitration may be entered in any court of competent jurisdiction, or application may be made to such court for a judicial acceptance of the award and enforcement, as the law of the state having jurisdiction may require or allow.  The provisions of this Section shall survive the termination of this Agreement.

x.      <u>Severability</u>.  If any provision of this Agreement is held invalid by law, rule, order or regulation of any relevant government, or by the final determination of a court of last resort, such invalidity shall not effect (a) the other provisions of this Agreement; (b) the application of such provision to any other circumstances other than that with respect to which this Agreement was found to be unenforceable, or (c) the validity or enforceability of this Agreement as a whole. The parties hereto agree to negotiate in good faith to replace any provision found to be unenforceable so that the economic effects of this Agreement for each party remain the same.

xi.      <u>Waiver</u>.  Any delay or omission by either party to exercise any right or remedy under this Agreement shall not be construed to be a waiver of any such right or remedy or any other right or remedy hereunder. Except as otherwise explicitly set forth herein, all of the rights of either party under this Agreement are cumulative and may be exercised separately or concurrently.

xii.      <u>Entire Agreement</u>.  This Agreement contains the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements or understanding regarding the same subject matter. The parties have not created and do not intend to create by this Agreement any enforceable rights in any third party under this Agreement, including, but without limitation, Members and Vendors.  The parties acknowledge and agree that there are no third party beneficiaries to this Agreement.

**EXECUTION PAGE FOLLOWS**

This Agreement is entered into and effective as of this ___ day of _____, 20__,

LOGISTICARE SOLUTIONS, LLC

Date: _____ 12/4/2013 _____

Signature: _Alberto Contira_

Printed Name: _Albert Contira_

Title: _____ CAo _____

PROVIDER

_SMR Ambulance Services_

Date: _10/23/13_

Signature: _Attuuu_

Printed Name: _Vitaliy M Moroz_

Title: _President_